**Clarence WILKERSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 79–1133.**

District of Columbia Court of Appeals.

Argued Nov. 26, 1980.

Decided Feb. 26, 1981.

M. Elise Haldane, Washington, D. C., appointed by the court, for appellant.

Thomas C. Hill, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and Steven Gordon, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, GALLAGHER and NEBEKER, Associate Judges.

KELLY, Associate Judge:

Appellant was convicted by a jury of rape (D.C.Code 1973, § 22–2801), and sentenced to ten to forty years imprisonment. He appeals his conviction, challenging the validity of his initial stop, his subsequent arrest, various trial court rulings, and one jury instruction.

At a pretrial hearing on August 22, 1979, appellant moved to suppress identifications made by the complainant and an eyewitness on the grounds that they were the fruit of an illegal arrest and of an impermissibly suggestive showup. The testimony adduced at the hearing revealed that the complainant was raped by two men during the early morning of February 17, 1979, in an alley behind the 600 block of Princeton Place, N.W. Her screams were heard by Mr. Howard Malloy who had been playing cards with friends in a house on the same block. From the window of his host's dining room, Malloy saw two men dragging a young woman through the alley. The police were contacted and Lieutenant Robert Scanlon, who shortly arrived at the scene, found the complainant standing in the snow, wearing a red blazer and naked from the waist down. She was in shock and could only describe her assailants as two black men. A radio lookout was broadcast and received by Officer Brian Presley who immediately cruised the area to look for suspects. At the early morning hour in weather described as bitter cold, the streets of the surrounding residential neighborhood were desolate except for appellant who was walking down the sidewalk about half a block from the location of the rape incident. Officer Presley turned a corner, and stopped his cruiser in appellant's direct path. When appellant approached, Presley told him about the recent rape and asked him whether he had seen anyone in the area. Appellant answered in the negative, then, at the officer's request, gave his name and address. Asked why he was out in such weather at such an hour, appellant explained that he could not sleep and that he was going to the Little Tavern. Officer Presley testified that appellant said "after that he was going to go to his brother's house over at 11th and Massachusetts Avenue," which was about two miles away. Officer Presley also stated that it did not appear that appellant was walking in the direction of the Little Tavern; he had passed the street which would have led him there most directly. At Presley's request, appellant agreed to accompany the officer to the scene of the crime. There he was brought in front of the police cruiser in which the complainant was sitting. By the light of a street lamp and with the car's headlights beamed on appellant, the complainant identified him as one of her assailants, at first quite certainly, then upon reflection, less so.[1] The lighting also revealed that appellant had fresh mud on his pants. Lieutenant Scanlon noted to Officer Presley that it was the same type of mud as that on the garage floor where the rape occurred.

---

1. Lieutenant Scanlon testified that the complainant's words were, "Yes, that's him ... I think that's him ... I believe that's him." At trial, the complainant's recollection on the stand was "[t]hat it looked like him. I was really—really, I was hurt, I guess, hysterical almost. I wasn't sure. It looked like him.... I said, 'It looks like one of them.' "

Officer Presley thereupon arrested appellant.

Howard Malloy had viewed appellant's showup from the window of his friend's house but did not at that time volunteer his own identification. About an hour or so later, however, on his way to work, he encountered another police officer who had been present on the scene and asked whether appellant had been arrested. Malloy testified that when he learned that appellant might be released, he informed the officer that he could positively identify appellant and that he did not want appellant allowed back into the neighborhood because he had a sixteen-year-old daughter.

The court denied appellant's motion to suppress the identifications by the complainant and Malloy, rejecting appellant's arguments that he was illegally arrested and that he was the victim of an impermissibly suggestive showup. The case proceeded to trial on the same day.

In addition to testimony by the witnesses who had appeared for the government at the pretrial hearing and testimony by the complaining witness, the government's case included several color photographs of the complainant's body which were admitted into evidence over objection. A government witness also testified that semen of the same blood group factor was found on both the complainant's and appellant's clothes. Another witness testified that there was no interchange of pubic hairs between the complainant and appellant, but that some red woolen fibers, matching the complainant's blazer, were found on appellant's clothing. No in-court identifications were made by either Malloy or the complainant. Malloy described to the jury the appearance of the two men he had seen in the well-lighted alley and stated that, observing the showup, he was certain that appellant was one of the assailants.

At trial, appellant testified in his own defense. He explained that he was stopped by Officer Presley while on his way to the Little Tavern to meet his brother in order to borrow some money from him. His brother worked at the nearby Rock Creek Cemetery and would go by the Little Tavern on his way to work. Appellant also testified that the mud on his pants came from the gas station where he worked and that he owned a red sweater which he kept with the rest of his clothes.

At the conclusion of the trial, defense counsel moved to have a "Telfaire" instruction[2] given to the jury. This was denied by the trial judge who also denied appellant's renewed motion for a judgment of acquittal at the close of the government's evidence.

 We reject appellant's argument that his initial detention and transportation to the scene of the crime were illegal. The conduct of Officer Presley in questioning appellant and requesting him to accompany him to the scene constituted an investigatory stop, not an arrest. As such, the officer's conduct is justifiable if it is reasonable and if it is based on an articulable suspicion that appellant had committed the crime. *United States v. Cortez,* —— U.S. ——, 101 S.Ct. 690, 66 L.Ed. 621, 49 U.S.L.W. 4099 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed. 2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *District of Columbia v. M. M.,* D.C.App., 407 A.2d 698, 701 (1979), we explained that " 'certain temporary restraints in situations of street encounters on less than probable cause' are constitutionally valid provided 'specific and articulable facts . . . warrant the intrusion' and there exists 'a reasonable relationship between the scope of the stop and questioning and the justification for their initiation.' " (Quoting *Harris v. United States,* D.C.App., 382 A.2d 1016, 1018 (1978)). Here as in *M. M.* and *Harris,* the initial stop and the ensuing detention can be justified by comparing the facts known to the officer at each step of the encounter

---

2. This was patterned on the proposed instruction in *United States v. Telfaire,* 152 U.S.App. D.C. 146, 469 F.2d 552 (1972).

with the extent of the police intrusion upon appellant's Fourth Amendment rights. "[W]here the facts ascertained during such an encounter gradually escalate toward probable cause, reasonable extension of the duration of the stop to await the outcome of further police investigation is justified." *Harris v. United States, supra* at 1019.

Thus, when Officer Presley first stopped appellant to question him, he knew that (1) the lookout was for two black males, (2) appellant was a black male, (3) appellant was within one block of the scene of the crime, (4) the call for help had been made within the past half hour, (5) the streets were empty because it was the middle of a bitter cold night in a residential area, (6) appellant was the only person out on the streets. After their initial conversation, Officer Presley developed additional suspicions when appellant told him that he was headed toward the Little Tavern, but he had already passed the street which would have been the most direct route to that destination. At the suppression hearing, the officer testified that appellant told him that he was going to walk to his brother's apartment after stopping at the Little Tavern. This could reasonably have raised additional doubts about appellant's veracity in Officer Presley's mind since he might well have wondered that in such weather appellant planned to walk to an address which he knew was two miles away. The request that appellant drive half a block with the officer to the scene of the rape may have appeared coercive to appellant, but was only a limited restriction on his freedom. The value of an on-the-scene identification, while the victim's memory is still fresh, justified not only the short transportation of appellant to the scene, but also the showup itself, which constituted a minimal added intrusion on appellant's Fourth Amendment rights. *See United States v. Wylie,* 186 U.S.App.D.C. 231, 569 F.2d 62 (1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978) (compelled return to scene of crime for brief inquiry is reasonable procedure for investigating suspicious circumstances).

■ Appellant's subsequent arrest was justified by probable cause based on the facts surrounding the initial *Terry* stop together with the showup identification and Officer Presley's observation of the mud on appellant's pants. The court, therefore, properly rejected appellant's argument that the identifications were the fruit of an illegal arrest.

■ Moreover, the showup itself was not unreasonably suggestive. "[A] defendant is not denied due process of law unless, in the totality of the circumstances, the on-the-scene confrontation was unnecessarily suggestive and conducive to the substantial likelihood of irreparable misidentification." *Singletary v. United States,* D.C.App., 383 A.2d 1064, 1068 (1978) (citations omitted). And "[i]n considering the totality of the circumstances, an immediate on-the-scene confrontation has uniquely powerful indicia of reliability which more than counterbalance any suggestivity, absent special elements of unfairness." *Id.* (citations omitted). At the time of the showup, appellant had not been arrested and was not handcuffed. Mere custodial status does not, of itself, establish special unfairness. *See id.* No leading questions were put to the complainant and no other reasons to positively identify appellant were proffered by the officers. The reliability of the complainant's identification was unaffected by any improper conduct by the police. We therefore need not evaluate the reliability of the showup according to the same factors which are used to test the reliability of a showup which is "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). *Compare Cureton v. United States,* D.C.App., 386 A.2d 278, 284–87 (1978).

Nevertheless, evidence of reliability, such as the opportunity to observe appellant during the rape and the showup as a result of the length of the encounter, the good lighting and the complainant's attentiveness, and the proximity in time between the rape and the showup, bolster complainant's somewhat hesitant identification. Under

these circumstances, her hesitation appears to reflect the fact that she appreciated the critical importance of her identification, not merely that she was unable to make a completely positive identification. We conclude, therefore, that the trial court properly rejected appellant's alternative argument for suppression of the challenged identification by the complainant.[3]

Nor should Mr. Malloy's subsequent identification have been excluded from the evidence as suggestive or unreliable. Viewing the showup from a neighboring house, Malloy was clearly outside the sphere of influence of the police officers and not subject to their suggestions. The reliability of Malloy's identification is established by the fact that he had seen appellant in the alley twice before the showup and noted that he was light-complected and dressed in jeans, a white tam and a parka with the hood pulled over the tam. Malloy testified pretrial that the man presented to the complainant at the showup was the same man he had seen dragging the complainant through the alley and later returning to go through the contents of her purse.

Since both out-of-court identifications were properly ruled admissible and presented to the jury, the trial court correctly denied appellant's motion for a judgment of acquittal. The jury was instructed that the parties stipulated that both of the complainant's assailants had physically penetrated her vagina. Photographs were introduced on the issue of force. Identity was therefore the critical issue. In this regard, the scientific evidence matching the fibers and semen specimens found on the complainant's and the appellant's clothing, together with the eyewitness identifications, were sufficient evidence for a reasonable jury to find guilt beyond a reasonable doubt. *Curley v. United States*, 81 U.S. App.D.C. 389, 160 F.2d 229, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

Appellant raises two other points which we find to be without merit. The first is that in view of the stipulation regarding the rapes, the trial court erroneously failed to suppress photographs of the complainant's body. But the jury was only instructed that the stipulation was that there had been physical penetration of the penis into the vagina. This was not probative of the separate question of whether appellant had forcibly raped the complainant. The photographs were therefore relevant and necessary to meet the government's burden of proof beyond a reasonable doubt on each of the elements of the crime. The trial judge selectively reviewed the photographs before allowing any of them into evidence and we do not see any abuse of discretion in this task. *See Pittman v. United States*, D.C.App., 375 A.2d 16, 19 (1977).

We also reject appellant's claim that the court's failure to give his requested instruction concerning the identification testimony introduced at trial was clearly erroneous. Appellant's proposed instruction was modeled on the instruction given in *United States v. Telfaire*, 152 U.S.App. D.C. 146, 469 F.2d 552 (1972), and approved by the Circuit Court of Appeals. In *Smith v. United States*, D.C.App., 343 A.2d 40, 42–43 (1975), this court recognized the importance of carefully instructing the jury on the question of identification in a one-witness case. We noted however that the Criminal Jury Instructions for the District of Columbia, No. 5.06 (2d ed. 1972), adopted unchanged in the 1978 Third Edition, fulfilled this purpose. *Id.* at 43. That model instruction was given by the court in the instant case, even though there was more than one eyewitness identification. The trial court therefore was arguably more cau-

---

3. In his reply brief, appellant argues that *In re L. D. O.*, D.C.App., 400 A.2d 1055 (1979), requires exclusion of the complainant's extra-judicial showup identification as inadmissible hearsay. We note first that only Lieutenant Scanlon's testimony might be considered hearsay, but under the cited authority it would have been an admissible exception to the hearsay rule because the declarant was available for cross-examination, *Morris v. United States*, D.C.App., 389 A.2d 1346, 1351 (1978), and unlike in *In re L. D. O.*, the declarant here did not completely discount the reliability of his extra-judicial identification.

tious than necessary in protecting appellant's due process rights.

In consideration of the foregoing reasons, the judgment on appeal is

*Affirmed.*