729 A.2d 334 (1999)
In re T.L.L.
No. 96-FS-470.
District of Columbia Court of Appeals.
Argued January 7, 1999.
Decided May 13, 1999.
*336 Richard S. Greenlee, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.
Sidney R. Bixler, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, Robert R. Rigsby, Deputy Corporation Counsel, and Rosalyn Calbert Groce, Director, Policy and Appeals Branch, were on the brief, for appellee.
Before SCHWELB and FARRELL, Associate Judges, and KING, Senior Judge.
SCHWELB, Associate Judge:
Following a bench trial, T.L.L., a juvenile,[1] was found guilty of armed robbery. On appeal, he contends that the trial judge erred by denying T.L.L.'s motion to suppress identification evidence. More particularly, T.L.L. claims that the police lacked reasonable articulable suspicion to detain him for purposes of a show-up identification *337 by the complaining witness. In light of the limited evidence presented by the District at the hearing on T.L.L.'s motion, we are compelled to reverse.

I.

THE EVIDENCE
At the motions hearing, which was held on February 2, 1996, the only witnesses for the District were the complainant, John Hatcher, and one of the arresting officers, Elizabeth Sharp-Hamlet. The District did not call Officer Gregory Phifer, who played the lead role in investigating the case, and who had testified extensively at the probable cause hearing, which was held on the day of T.L.L.'s arrest.[2]
Mr. Hatcher testified that at approximately 1 a.m. on April 5, 1995, he was robbed at gunpoint in the 500 block of 48th Street N.E. in Washington, D.C. Hatcher stated that a small station wagon occupied by four young men passed him and came to a halt. Two of the occupants got out of the car and rushed at him. One of the robbers was armed with a handgun and pointed it at Hatcher. The other robber allegedly T.L.L.went through Hatcher's pockets. Finding no money or valuables, the robbers took Hatcher's sweatshirt. The men then fled, and the gunman fired his weapon as they did so.
Shortly after the robbery, Hatcher flagged down a police car and reported the robbery to Officer Phifer. Hatcher gave Phifer a general description of his assailants. At the motions hearing on February 5, 1995, ten months after the robbery, Hatcher recalled the description as follows:
I told him the one with the gun, I told him he was light complexion, kind of slim, maybe about 5'10" or something. But he had the bandanna or some kind of cloth covering his face, the only thing I knew is he was light complexion. . . . And I couldn't give him a real good description maybe of the clothes, maybe dark clothing. . . . [T]he second guy ... he was maybe about four foot something. I don't know if I told him 4'10" or 4'11" . . . just so young looking, maybe about 15, 16, and just clear cut face. He just looked so young.
Mr. Hatcher described the assailants' car as
a smaller version of a station wagon, but maybe a blue or green, some dark color. . . it had . . . more or less a luggage rack or something on top of it ... older model.
Some undisclosed period of time after Hatcher provided these descriptions, officers drove Hatcher to a location near 44th Street and showed him a station wagon "that seemed like the vehicle the guy was in." Hatcher was then transported to 4427 Hayes Street for a "show-up," and police officers brought out four or five individuals, one at a time, to determine whether Hatcher could identify any of them. Hatcher positively identified the first suspectT.L.L.as the robber who had gone through his pockets. Hatcher was unable to identify any of the other men.
Officer Sharp-Hamlet testified that between 1 a.m. and 2 a.m. on April 5, 1995, she monitored a broadcast lookout for suspects in a robbery. According to Officer Sharp-Hamlet, the lookout was for three or four black males. One of the robbers was described as "approximately 14 to 18 years of age, medium complexion, darkcolored clothing." A second suspect was described as "another black male in his early teens to late teens, with dark brown complexion, wearing dark-colored clothing." The descriptions included no information regarding height, weight, presence *338 or absence of facial hair, or any other distinctive characteristic. Officer Sharp-Hamlet testified that "a location was given [in the broadcast] as to the whereabouts of possible suspects." The specified location was 4427 Hayes Street N.E.
Upon receiving this information, Officer Sharp-Hamlet proceeded to the Hayes Street address. She testified that four or five[3] young men were standing on the stoop, some of whom matched the "general description" in the broadcast lookout.[4] When Officer Sharp-Hamlet and several other officers got out of their police cars, the young men all ran inside the building. The officers apprehended most of the suspects and exhibited them, one at a time, to the complaining witness.
The District made no attempt to explain the significant differences between Hatcher's description of the suspects and the lookout monitored by Officer Sharp-Hamlet. There was no testimony that T.L.L. individually matched even the very general description reported by Officer Sharp-Hamlet. Indeed, at the motions hearing, Officer Sharp-Hamlet did not remember T.L.L. at all, and she could not identify him in court. Moreover, there is no information in the record as to why the lookout directed officers to the address on Hayes Street at which T.L.L. was apprehended (and at which, as it turned out, he also lived).

II.

THE TRIAL JUDGE'S DECISION
The trial judge denied the motion to suppress identification. He ruled, in pertinent part, as follows:
It seems to me that ... Officer [Sharp-Hamlet], when she focused her attention on the Respondent and the other young men with him, when she kind of zeroed in on them, had before her information that was sufficiently particularized for her to take the measures and the steps that she did.
I think that she was justified in so doing because she recognized that the young men or older boyshowever you want to style itthat she saw were close both in place and time to the offense which *339 happened early in the morning, about 1:00 in the morning.
* * *
But she did have a description of at least two people involved in the robbery, and she had a description by race, by age, by sex, by complexion, and by location within time and place, as I say. She also knew that there were two people, at the very least, involved.
And when she saw these young men in front of the apartment building, she suspected that they may have been the people involved because, at the very least, one, and probably two, met the description given by these factors here.
The judge also noted that the vehicle identified by the complainant was located near the apartment building at which T.L.L. was apprehended. He did not consider this information, however, because the District had not established that, at the time that T.L.L. was detained, the police were aware that a vehicle was involved in the robbery. The judge described T.L.L.'s quick entry into the building as an "ambiguous" gesture, but he concluded that this conduct was incriminating at least to a modest degree.
After the motion to suppress identification was denied, the parties proceeded to trial. The judge credited Hatcher's identification of T.L.L. as extremely reliable and found T.L.L. guilty as charged. This appeal followed.

III.

LEGAL ANALYSIS

A. The legal standard.

It is undisputed that the detention of T.L.L. by the police in order to present him to the complainant for identification at the show-up constituted a seizure within the meaning of the Fourth Amendment's proscription against unreasonable seizures. See, e.g., Womack v. United States, 673 A.2d 603, 608-09 (D.C.1996), cert. denied, 519 U.S. 1156, 117 S.Ct. 1097, 137 L.Ed.2d 229 (1997); In re M.E.B., 638 A.2d 1123, 1126-27 (D.C.1993), cert. denied, 513 U.S. 883, 115 S.Ct. 221, 130 L.Ed.2d 148 (1994). The legality of the seizure turns on whether, in light of all of the circumstances, the officers had the requisite reasonable articulable suspicion to make an investigatory stop. See generally Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In this appeal, T.L.L. challenges the trial judge's disposition of that issue in the District's favor.
In reviewing the denial of T.L.L.'s motion to suppress evidence, we will not disturb the trial judge's findings of fact unless they lack evidentiary support in the record. D.C.Code § 17-305(a) (1997); see also United States v. Turner, 699 A.2d 1125, 1127 (D.C.1997). The evidence, and all reasonable inferences from the evidence, must be viewed in the light most favorable to the District, as the party that prevailed below. See, e.g., Peay v. United States, 597 A.2d 1318, 1320 (D.C.1991) (en banc); Ruffin v. United States, 642 A.2d 1288, 1291 (D.C.1994). Whether, in light of the judge's evidentiary findings, the police "had the requisite particularity for a reasonable articulable suspicion to stop [T.L.L.] . . . is a question of law we decide de novo." Turner, supra, 699 A.2d at 1127; see also Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).
Where, as here, the existence of a reasonable articulable suspicion is at issue, the District's burden is not an onerous one. See, e.g., Gomez v. United States, 597 A.2d 884, 888-89 (D.C.1991). "Although the term eludes precise definition, articulable suspicion is substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence." Turner, supra, 699 A.2d at 1128 (citations, brackets, and ellipsis omitted). Nevertheless, in justifying the particular intrusion, "the police officer must be able to point to specific and articulable *340 facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Curtis v. United States, 349 A.2d 469, 471 (D.C.1975) (quoting Terry, supra, 392 U.S. at 21, 88 S.Ct. 1868).

B. Particularity.

In order to pass muster under Terry and its progeny, the articulable suspicion must be "particularized as to the individual stopped." In re A.S., 614 A.2d 534, 537 (D.C.1992) (citations omitted). A police officer's "inchoate and unparticularized suspicion or hunch" is not sufficient. Turner, supra, 699 A.2d at 1128 (emphasis in original; citation omitted). The "demand for specificity in the information upon which police action is predicated is the central teaching of this court's Fourth Amendment jurisprudence." United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (citations omitted); see also Turner, supra, 699 A.2d at 1128.
At least in the absence of other circumstances that provide sufficient particularity, "a description applicable to large numbers of people will not suffice to justify the seizure of an individual." Turner, supra, 699 A.2d at 1128-29 (citation omitted). A leading commentator on Fourth Amendment jurisprudence has written:
Quite obviously, the more the description provided ... can be said to be particularized, in the sense that it could apply to only a few persons in the relevant universe, the better the chance of having at least sufficient grounds to make a stop.
4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.4(g), at 198 (3d ed.1996) (quoted in Turner, supra, 699 A.2d at 1129 n. 3).
So far as the record of the suppression motion hearing shows, the information on which the police acted in detaining T.L.L. was altogether lacking in particularity. According to Officer Sharp-Hamlet, the only witness who testified with regard to the broadcast lookout, the two robbers were described simply as black teenagers wearing dark clothing; one of them was said to have a "dark" complexion, the other a "medium complexion."[5] Without identifying information with respect to height, weight, facial hair or other distinguishing features, this description could have fit many if not most young black men. Moreover, even these very general descriptions in the lookout were at odds with the information provided by Hatcher (as Hatcher recalled it at the motions hearing), and there was no evidence at all that T.L.L. personally matched the lookout.
In this case, the officers detained at least five, and perhaps as many as ten, young men"corralled" was the verb aptly selected by the trial judgeeven though only two very general descriptions had been received by the arresting officers. This, too, is a circumstance militating against affirmance. See In re A.S., supra, 614 A.2d at 540 ("dragnet seizure of three youths who resembled a generalized description cannot be squared with the longstanding requirement for particularized, individualized suspicion"); Turner, supra, 699 A.2d at 1130 (same).
The generality of the descriptions of the robbers might not have been fatal if the accused had been apprehended immediately after the robbery at the location *341 where the crime occurred. For purposes of determining whether the police suspicion is sufficiently particularized, the relevant universe "will be determined primarily by the size of the area within which the offender might now be found (as indicated primarily by the amount of time which has passed since the offense) and the number of people about in that area." Id. at 1129 n. 3 (quoting 4 LAFAVE, supra, § 9.4(g) at 198 n. 297). "[S]ometimes the universe will be small enough that no description at all will be required to justify a stopping for investigation." 4 LAFAVE, supra, at 198 n. 298. Here, however, the District has made no showing of immediacy, either temporal or spatial. The trial judge found that T.L.L. was stopped by the police "many minutes" after the offense. Although the judge did not define "many," the record shows that a substantial time elapsed.[6]

C. The Hayes Street address.

Officer Sharp-Hamlet testified that she proceeded to 4427 Hayes Street because that address was identified in the lookout as the place where the suspects might be found. Obviously, the police had received some information which led them to the apartment house at which T.L.L. lived and at which he was identified and arrested. If the nature of the information on which the police relied had been disclosed to the court at the hearing on T.L.L.'s motion to suppress, this might well have satisfied the District's modest burden in a case of this kind, for "exact location for the arrest team adds a very strong element to the totality of the circumstances." Hill v. United States, 627 A.2d 975, 979 (D.C.1993). But the fact that the officers had information leading them to 4427 Hayes Street can contribute to the articulable suspicion calculus only if the judge has been apprised of sufficient facts to enable him to evaluate the nature and reliability of that information. See, e.g., Whiteley v. Warden, 401 U.S. 560, 564-68, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); United States v. Hensley, 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); United States v. Cutchin, 294 U.S.App. D.C. 95, 96-97, 956 F.2d 1216, 1217-18 (1992); United States v. Robinson, 536 F.2d 1298, 1299-1300 (9th Cir. 1976); but cf. id. at 1300-02 (Smith, J., dissenting); Commonwealth v. Queen, 536 Pa. 315, 639 A.2d 443, 446 (1994). Here, no such evidence was adduced.

D. "Flight."

The District also relies on T.L.L.'s rapid retreat into the apartment house upon the approach of the police as a factor supporting the trial judge's finding of articulable suspicion. The judge characterized this apparently evasive conduct as "an ambiguous gesture" or an "equivocal sort of thing to do," but he nevertheless concluded that it "had an extra weight that was incriminating, you might say, it was not exonerating." We agree with the judge that T.L.L.'s actions at the scene *342 were relevant, see, e.g., Lawrence v. United States, 509 A.2d 614, 616 (D.C.1986) (citations omitted), but we do not believe that this evidence added enough to the District's otherwise flimsy case to put the District over the top. See, e.g., Smith v. United States, 558 A.2d 312, 319 (D.C. 1989) (en banc):
For flight to suggest consciousness of guilta mentality other than a legitimate desire to avoid the policethat flight not only must be very clearly in response to a show of authority but also must be carried out at such a rate of speed, ..., or in such an erratic or evasive manner, that a guilty conscience is the most reasonable explanation.
See also Alberty v. United States, 162 U.S. 499, 511, 16 S.Ct. 864, 40 L.Ed. 1051 (1896), recognizing that "men who are entirely innocent do sometimes fly from the scene of a crime[7] through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses."
In the present case, the entire group of young menat least five, and perhaps as many as ten to fifteen, according to Officer Phifer's almost contemporaneous recollectionran into the apartment house when the officers got out of their car. The approach of the police thus led the innocent as well as the possibly guilty to try to make themselves scarce. Moreover, T.L.L. was a resident of the apartment house, although it is unclear whether the officers knew that he lived there. Even taking T.L.L.'s "flight" into consideration, we conclude that the District failed to make a sufficient showing of articulable suspicion.[8]

E. The evidence not presented.

At the probable cause hearing, Officer Phifer testified, inter alia, that on the night of the robbery he initially monitored a radio run reporting a shooting in the 500 block of 48th Street. Upon arrival there, he and other officers interviewed the complaining witness (obviously Hatcher), as well as "one actual witness to the incident," a neighbor who had called the police. Phifer stated that while Hatcher was describing the robbers, "that's when I was getting a lot of the information of where these subjects could possibly be at." An officer subsequently located a green Pinto which Hatcher promptly identified as the car utilized by the robbers.[9]
For reasons that are not apparent from the record, almost none of the foregoing information was produced ten months later at the hearing on T.L.L.'s motion to suppress. As a result, the District's case boiled down to the claim that two of a group of about five (or ten) suspects detained about an hour after the robbery at a location four blocks from the scene of the crime matched a description which could *343 have covered many or most young black males. Whatever the result might have been if Officer Phifer had been questioned about the course of his investigation and about the information provided to the police by the neighbor or by other individuals, we cannot sustain the seizure of T.L.L. on the basis of the evidence presented at the suppression hearing.[10]
In Kaiser v. State, 296 Ark. 125, 752 S.W.2d 271 (1988), officers in Randolph County, Arkansas received a tip from their counterparts in Missouri that the defendant's car, which was identified by description and license number, would be travelling through the county, and that it contained a pistol and fifty pounds of marijuana or $25,000 in cash. The Arkansas officers stopped the car and recovered a pistol, drugs, and cash. In a forfeiture proceeding instituted against him in Arkansas, the defendant moved to suppress the evidence seized from him. The prosecution established that Arkansas officers had received a tip from police in Missouri, but offered no evidence as to the source of the Missouri officers' information. Relying on the Supreme Court's opinion in Hensley, supra, the Supreme Court of Arkansas held that the contraband had been unconstitutionally seized:
The [United States] Supreme Court's opinion makes it clear that the failure of the issuing police agency to have reasonable suspicion to stop and search a vehicle cannot be immunized from a Fourth Amendment objection by passing the information on to another police officer or department which then acts upon it. In this case, the informant may well have been a reliable one, and the Missouri State Police may well have had a reasonable suspicion of Kaiser. We cannot know that, however, as the record is devoid of testimony supporting that conclusion.
Id. at 274.
In the present case, as in Kaiser, Officer Phifer may well have had a basis for dispatching officers to T.L.L.'s apartment house. The relevant facts, however, were not communicated to the court. Accordingly, we conclude that the motion to suppress Hatcher's show-up identification of T.L.L. should have been granted.

F. Proceedings on remand.

The District contends that, even if the show-up identification should have been suppressed, this court should affirm the adjudication of guilt on the strength of Hatcher's identification of T.L.L. in the courtroom. The District relies primarily on United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). We do not agree with the District's position.
The trial judge's error in admitting evidence of the show-up identification in violation of the Fourth Amendment was constitutional in nature. The courtroom identification was made ten months after the robbery, and we cannot conclude, without further findings by the trial judge, that the admission of the earlier identification, made less than an hour after the offense, was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
In Crews, the Supreme Court sustained the defendant's conviction on the basis of a courtroom identification, notwithstanding the suppression of pretrial identifications, because the trial judge expressly found that the courtroom identification rested on the victim's independent recollection of the initial encounter and was not a fruit of the earlier, constitutionally flawed identifications. 445 U.S. at 472-73, 100 S.Ct. 1244. No such finding *344 has been made in this case, and we leave to the trial judge on remand, at least in the first instance, the question whether the circumstances here are analogous to those in Crews.

IV.

CONCLUSION
For the foregoing reasons, the decision of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.
So ordered.
KING, Senior Judge, dissenting:
In my view, the majority is wrong in concluding that the show-up identification should have been suppressed because there was insufficient articulable suspicion to support the detention of respondent moments before the victim of the armed robbery identified him. The majority has strayed by relying upon facts not found by the trial court and in not giving sufficient weight to certain other factors that courts have found to be important in evaluating the legality of police conduct in these circumstances. Therefore, I dissent.
I do not seriously quarrel with the majority's recitation of the facts as set out in Part I. "THE EVIDENCE," so far as it goes. That fact statement is mainly based upon the motion to suppress testimony of the victim and Officer Elizabeth Sharp-Hamlet ("Sharp" or "detaining officer"), the lead officer in the seizing of respondent. The fact statement falls short, however, because some crucial points, as discussed below, are either only touched upon or are not mentioned at all. Moreover, the majority does not acknowledge that, in several crucial respects, Officer Sharp's testimony was corroborated by respondent's testimony at trial. As we have said on several occasions, we may consider uncontradicted trial testimony when reviewing a trial court's ruling on a motion to suppress. Patton v. United States, 633 A.2d 800, 818 n. 11 (D.C.1993) ("we may properly consider [the respondent's trial] testimony on appeal in support of the trial court's ruling.").[1] Finally, in its analysis of the evidence, the majority unduly emphasizes some of the testimony of the investigating officer even though it is clear that the trial court gave no weight to that testimony.
The facts show that the victim was walking toward his home in a residential section of Northeast Washington, at 1:00 a.m., on a cold April night. A vehicle, containing three or four people, passed by. Shortly afterward, the victim was accosted by two males, one of whom was armed with a handgun. The other assailant, later identified by the victim as respondent, went through the victim's pockets. Finding nothing of value, the robbers took the victim's sweater and then fled, firing the weapon as they did so. They then entered the vehicle seen earlier and drove away.
At the suppression hearing, ten months later, the victim testified that he told the police at the scene that the person holding the gun was a light complected black male, wearing dark clothing, with a bandanna covering his face. He could not recall whether he described the gunman as a teenager. The assailant that searched him was 4'10" or 4'11" "maybe about 15, 16 and clean cut face. He just looked so young." The victim also testified that he could not see the two people in the car.
*345 The record does not include the precise content of the broadcast made by the investigating officer, apparently because the radio channel used was not tape recorded. However, the officer who detained respondent and his companions testified that the broadcast reported that three or four black males were involved. Only two were described: both were teenagers wearing dark clothing; one was dark skinned and the other medium complected.
In addition, there were other important facts known to the trial judge, even though they were not specifically mentioned by him when he rendered his decision. First, the court was aware that respondent was thirteen years old at the time of the offense,[2] a fact entirely consistent with the victim's observation that "God, dag, this guy look awful young" to be committing an armed robbery at 1:00 a.m. Of course, respondent was present at the hearing and the judge was able to observe him. Neither the judge nor respondent's counsel questioned the victim's characterization of respondent. It, therefore, would not be presumptive to conclude that the victim's description was an accurate one, i.e., respondent looked to be young. Second, although it was April, the victim testified that it was cold that night. Finally, the respondent testified at trial that the night in question was a school night, a fact that may or may not have been known by the trial court at the time he ruled on the suppression motion, but one that we can consider in support of the trial judge's ruling.[3]Patton, supra, 633 A.2d at 818 n. 11.
I will now turn to the circumstances of the detention. Officer Sharp testified that after hearing the broadcast regarding the robbery, she was cruising in a police vehicle with her partner near an apartment house, which is approximately four blocks from the scene of the robbery. Based on the lookout, she was searching for a group of three or four people, at least two of whom were teenagers. She spied a group of four or five youths[4] in front of the apartment building, two of whom met the descriptions she had heard broadcast. The officer did not specify how they met the description and she was not pressed further about that testimony. It is clear, however, that the trial judge credited the officer on that point and there is no basis for our looking behind the implicit finding by the trial court that two of the people in the group met descriptions provided by the victim. D.C.Code § 17-305(a) (1997) (we will not disturb the trial judge's findings of fact unless they lack evidentiary support in the record).
As the majority notes, the record does not reveal the time of this observation. By working back from the time the police reports indicate the arrest took place, the majority estimates that the detention occurred approximately fifty-five minutes after the robbery. Ante at 341 n. 6. The time of detention is not controlling, however. Instead, we should focus on the time the detaining officer first observed respondent and his companions in front of the apartment building. The officer testified that she saw them on the first pass by the *346 building.[5] She then left the area to arrange to have other officers posted at the back entrance of the building to cut off escape. It was only after the other officers were in place that the detaining officer returned to the front of the building. Officer Sharp testified that as she approached respondent and his companions they ran. However, they were promptly detained by her and the other officers.
The time lapse between the pass-by when Officer Sharp first saw respondent's group and her return is not stated in the record of the suppression hearing. At trial, however, respondent testified that ten to fifteen minutes elapsed between the two appearances of the police car. Assuming that the positioning of the additional officers took some small amount of time, that estimate by respondent would not be too far off base. Therefore, it is not unreasonable to assume that respondent and his friends were first observed no more than forty to forty-five minutes after the robbery.[6]
It was after respondent and his companions ran and were detained that the onscene identification by the victim took place. It is that identification that the majority concludes was improperly admitted because it was the fruit of an unlawful detention. Before turning to the governing legal principles which I think compel affirmance by us, I think it important to address the major factual errors made by the majority in reaching their decision.
In its analysis, the majority emphasizes earlier testimony of the investigating officer that ten or possibly more people were present when Officer Sharp arrived on the scene to detain respondent. The theory of the majority is that rather than detaining a group of teenagerswhich included two fitting the description of the robbers and was about the same size as the gang that committed the offensethe police attempted to apprehend at least ten to fifteen people. That description of events is contrary to that found by the trial judge. Significantly, it is also at odds with what occurred as described by the respondent himself.
The circumstances giving rise to this misperception of the facts were as follows. The investigating officer testified at the probable cause hearing, held later on the day that respondent was arrested, that he arrived at the apartment house at the same time as Officer Sharp and there were "about 10 to 15 subjects standing out in the street, all of which ran." He also testified that approximately ten people were detained. In contrast, at the suppression hearing, the same officer testified that he arrived at the apartment house after Officer Sharp had begun the process of detaining respondent and his companions and that there were ten people standing around then. He explained, however, that the standers were onlookers who had gathered after the police arrived and that they were not part of the group that was detained.[7]
My reading of the trial judge's remarks made in support of his ruling persuades me that the trial court gave no weight to the initial version given by the investigating *347 officer.[8] That conclusion is consistent with Officer Sharp's testimony in which she specifically stated that she did not see ten to fifteen people. As she said, "four to five was about it." Id. Finally, respondent in his trial testimony was emphatic. When the police arrived the last time, he was there with four of his friends, there "weren't 10 people there," and he and three of his friends were detained. Thus, any reliance on the presence of more than the four or five people would be contrary to a fair reading of the record and the trial judge's assessment of the facts.
Having determined the full and accurate factual context on which the trial judge's ruling was based, I will now turn to the legal principles that govern. The majority correctly states those principles in Part III. A. of its opinion. The legality of the seizure turns on whether the officers had the requisite reasonable articulable suspicion to make an investigative stop.[9] "In reviewing a trial order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." Peay v. United States, 597 A.2d 1318, 1320 (D.C.1991) (en banc) (citations omitted). "`[A]rticulable suspicion' is . . . substantially less than probable cause [and] . . . considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Turner, 699 A.2d 1125, 1128 (D.C.1997) (citations omitted). In my view, applying these principles can result only in the conclusion that the police had sufficient "articulable suspicion" to justify the detention here. In so concluding, I take issue with the majority's determination that the description acted on by Officer Sharp was lacking in the requisite "particularity."
As the majority correctly observes, the articulable suspicion must be "particularized as to the individual stopped." In re A.S., 614 A.2d 534, 537 (D.C.1992) (citations omitted). In applying that requirement to these facts, the majority begins with an observation of a leading commentator on the subject who said:
Quite obviously, the more the description provided . . . can be said to be particularized, in the sense that it could only apply to a few persons in the relevant universe, the better chance of having at least sufficient grounds to make the stop.
4 WAYNE R. LAFAVE, SEARCH AND SEIZURES § 9.4(g), at 198 (3d ed.1996) (footnote omitted). The majority then concluded, citing In re A.S., that the descriptions in this case were insufficiently particularized. I agree that the description here was as general as that given in In re A.S., but as I discuss below, the circumstances there were quite different from what was present here.
It is not enough to look only at the description itselftime, place, weather, and other circumstances all can play a part. For example, Professor LaFave in the same treatise cited above also observed:
The sufficiency of a certain description given the passage of a certain length of time in a certain area may well depend upon the time of day; less will suffice in the early morning hours when few persons are about than would be a basis for a stopping at high noon. *348 LAFAVE, supra, at 206. We recognized as much in In re A.S., where we held that the description provided was not sufficiently particularized because there were many other people about. We said that the stop "occurred in the early evening hours, when it was still likely people would be about, and there were other people in the area. There was also a playground nearby, likely to attract young men to the area." 614 A.2d at 538.
The circumstances were very different in this case. There were a number of factors that significantly reduced the number of people who might fit the description provided to Officer Sharp: two dark-clad black teenagers accompanied by one or two other youths. First, it was a residential area not a potentially busy commercial location. Second, respondent was spotted somewhere between 1:30 a.m. and 2:00 a.m., a time when the number of people up and about is considerably less than early evening as in In re A.S. Third, it was a cold night. Although there is no indication that it was so cold that nearly everyone would be likely to stay inside, it was sufficiently cold to be a factor to take into account.
Finally, the people being sought were known to be teenagers, at least one of whom, in the words of the victim, was "very young," and it was a school night. I am not so naive to believe that teens, even the youngest teens, never stay out into the early morning hours on school nights. But, I would suggest that it is not an everyday occurrence. And, I would submit it is sufficiently uncommon that it was not out of line for the police to assume that the band of teenagers assembled in front of the apartment house that morning was likely to be the same band of teenagers that committed the robbery four blocks away, forty or so minutes earlier. Under these circumstances, therefore, I am satisfied that the police had the requisite articulable suspicion to stop them.
My conclusion that the police had sufficient articulable suspicion in these circumstances finds support in the case from this jurisdiction which is closest on the facts. See Wilkerson v. United States, 427 A.2d 923 (D.C.1981). There, two men assaulted a woman in the early morning hours on a bitterly cold night. The victim could only describe her assailants as two black men. Within thirty minutes of the call, Wilkerson was stoppedalonea block from the scene. He gave an unconvincing explanation for his presence and was returned to the scene where he was identified by the victim. We upheld the trial court's ruling that the stop was justified, emphasizing, in the face of a description far less detailed than those given here, that the time of night, the weather conditions, and the residential nature of the neighborhood were factors that weighed in favor of upholding the stop. Id. at 926. The court also relied, in part, on the questionable explanation given by the defendant concerning his presence on the street, a factor much like the flight that occurred in this case. Id. In short, while Wilkerson gave a phony explanation for his presence when he encountered the police, respondent and his friends ran and thereby, in the words of the Wilkerson court, the officer "developed additional suspicions." Id.
In sum, although all of the factors considered are important, for me the most important are the time of the detention and the ages of the assailants. Had these events occurred in the early evening as in In re A.S., I would agree with the majority that the descriptions were inadequate. But they did not. They occurred in the early morning hours at a time when the likelihood that any description that does not exclude the detainee, would be far less likely to ensnare the innocent. Or, in the words of Professor LaFave, quoted above, "the description ... could only apply to a few persons in the relevant universe." The relevant universe consisted of the cold, early morning hours when few people are expected to be about, especially young teens on a school night.
For all of these reasons, I dissent.

*349 APPENDIX
THE COURT: Thank you. Thank you, counsel, for you argument in this matter.
This issue surrounding the identification here are, if not manifold, at least not directed at a single issue; in other words, there are a variety of, I think, lesser issues that have to be addressed here, and your arguments have been helpful, as well as your citations here, Mr. Lamar, have been helpful in focusing on those issues that I feel should be resolved.
Having heard your argument, considering the testimony that I've received, and examined the exhibits, as well as referred myself to the authorities cited by the Defendant, is seems to me that the testimony established a course of conduct by the police that, at least so far as it led to their stopping the Defendant or the Respondent, as well as some other young men with them, was not unreasonable.
It seems to me that Police Officer Hammit [sic], when she focused her attention on the Respondent and the other young men with him, when she kind of zeroed in on them, had before her information that was sufficiently particularized for her to take the measures and the steps that she did.
I think that she was justified in so doing because she recognized that the young men or older boyshowever you want to style itthat she saw were close both in place and time to the offense which happened early in the morning, about 1:00 in the morning.
You know, I know there's been some disagreement as to exactly how much time went by between the offense and the identification, but I'm satisfied that it was a matter of many minutes, but not more, that Officer Hammit saw the Respondent and the others with him in front of the apartment building in which they were initially detained.
Moreover, there was a car parked nearby that was generallythat generally met the description of the car that was said to have been involved in this street robbery.
Now, the officers knew that the robbery had involved two men who had accosted and robbed Mr. Hatcher. Now, I'm not entirely sure of this, and my review of the notes doesn't make this clear to me. I do not know whether at the time Officer Hammit stopped theand her colleague stopped the men in the young men in the apartment building they knew there werethere was a car involved, allegedly involved.
If that were so, of course, the sufficiency that they had would have been stronger because the group in front of the apartment building would more likely meet the description would be more congruent with the group involved in the robbery because there would have been not only the gunmen, his accomplice, the wheelman, but there may have been a lookout as well. In other words, there may have been more than just two people.
But I put that to one side because I can't recall from the testimony, and my notes don't reflect it, whether she specifically knew that. But she did have a description of at least two people involved in the robbery, and she had a description by race, by age, by sex, by complexion, and by location within time and place, as I say. She also knew that there were two people, at the very least, involved.
And when she saw these young men if front of the apartment building, she suspected that they may have been the people involved because, at the very least, one, and probably two, met the description given by these factors here.
As I recollect, she didn't stop at once. Rather, she made a pass and returned, after having alerting some other policemen to position themselves so they could assist her in their next step. And when she came back, she said just as she was parking the car and was about to get out, the men ran inside. Didn't amble or shuffle away, they just ran inside all at once.
*350 Now, I understand that that's an ambiguous gesture or that's an equivocal sort of thing to do, but under the circumstances, givenas the officer knew them otherwise, I think it had an extra weight that was incriminating, you might say: it was not exonerating.
Moreover, there's this to be taken into account: this all took place, you know, in the early morning hours of the morning. It's not quite the same as if it had taken place at 8 in the evening or 10 in the evenning or 6 in the evening or 5 in the evening.
In any event, I think that the officer was justified in corralling the young men inside the apartment building with the expectation they would be brought out for a showup.
NOTES
[1] At the time of the offense, T.L.L. was thirteen years old.
[2] Officer Phifer was called as a defense witness at the February 2, 1996 hearing, but testified only briefly. He was not asked by either counsel to describe in any detail the course of his investigation. Phifer did, however, acknowledge certain testimony that he had given at the probable cause hearing, which was held on the day of the robbery. See note 3, infra.
[3] At the suppression hearing, Officer Phifer testified consistently with Officer Sharp-Hamlet's testimony regarding the number of young men apprehended. He was then asked, however, whether he had stated at the probable cause hearing that the police had pursued ten to fifteen individuals who had run into the building from the street, and that the officers had apprehended and detained approximately ten of these men inside the building and exhibited them, one by one, to Mr. Hatcher for identification. Phifer acknowledged that he had given this testimony, and it became a part of the record. Cf. D.C.Code § 14-102(b) (1998 Supp.).

It is not entirely clear whether the running from the stoop described by Officer Sharp-Hamlet represented the same incident as the running from the street described by Officer Phifer. Both events, however, occurred shortly before the show-up.
Our dissenting colleague suggests that the trial judge "did not credit the initial version given by [Officer Phifer]," in which Phifer stated that the police pursued ten to fifteen individuals. The judge did not make any explicit credibility finding on the issue, but it is most unlikely that the judge would have disbelieved Phifer's recollection a few hours after the events Phifer described and would have accepted instead ten-month-old recollections. In any event, our disposition obviously does not turn on the point. See pp. 340, 341 and 342, infra.
Judge King also cites T.L.L.'s testimony at the trial to the effect that he was with three or four of his friends, and not ten of them, at the time the officers detained him. That testimony is not properly before us on this appeal, for in reviewing a decision declining to suppress evidence, this court, under the authority cited by Judge King, may consider "all testimony from the suppression hearing and undisputed testimony at the trial." Patton v. United States, 633 A.2d 800, 818 n. 11 (D.C.1993) (per curiam) (emphasis added) (citing Martin v. United States, 567 A.2d 896, 902 n. 16 (D.C.1989)). T.L.L.'s testimony on this issue is obviously disputed in the suppression motion record.
[4] Officer Sharp-Hamlet stated that she had driven by the building earlier on the evening in question. The young men were not standing on the stoop at that time.
[5] As we have noted at page 337, Hatcher indicated that the gunman had "maybe dark clothing," but he said nothing about the color of the clothes worn by the young man who went through Hatcher's pockets (allegedly T.L.L.). Hatcher also stated that the gunman had a light complexion, but did not describe the color of the other robber's skin. The distinctive facts related by Hatcher about the individual who searched himhis short stature and extremely youthful appearancewere not included in the lookout as described by Officer Sharp-Hamlet. The fact that the judge could observe T.L.L. ten months later and confirm that he looked young, see dissenting opinion, post at 345, is irrelevant to the question whether the officers had articulable suspicion to detain T.L.L.
[6] Officer Sharp-Hamlet was extremely vague with respect to the times at which various events occurred. Officer Phifer testified that the robbery took place at about 1:00 a.m., and that T.L.L. was detained three to five minutes before his formal arrest. According to a representation by T.L.L.'s attorney which counsel for the District did not rebut, police documents gave the time of arrest as 2:00 a.m. This suggests that approximately fifty-five minutes elapsed between the robbery and the arrest. Even if the time separating the two events was shorter than that, cf. Judge King's opinion, post at 345 (relying on T.L.L.'s trial testimony), it was far too long to support any inference that the robbers (who had run to their vehicle after committing the offense) would probably still be at or near the scene of the crime. Cf. Cauthen v. United States, 592 A.2d 1021, 1023 (D.C.1991) (passage of fifteen minutes from time of offense to police response was "considerably longer than the delay involved in our past decisions on point"); Turner, supra, 699 A.2d at 1127 (sustaining Terry stop where officer arrived "within a minute" of the incident).

Moreover, T.L.L. was apprehended at 4427 Hayes Street, N.E., several blocks from the location of the robbery in the 500 block of 48th Street. There was testimony that these events took place in a residential area, albeit during the night-time hours on a cold night.
[7] In this case, the alleged "flight" was from a location some distance from the robbery. The evasive action by the group of young men at 4427 Hayes Street was thus more consistent with a general disposition to avoid contact with police officers, see Smith, supra, 558 A.2d at 319, than a suspect's flight from the scene of the crime would have been.
[8] Wilkerson v. United States, 427 A.2d 923 (D.C.), cert. denied, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981), on which our dissenting colleague relies, is distinguishable in critical respects from the present case. In Wilkerson, the police located the defendant, within half an hour of the call for help, only one block from the scene of the rape. Id. at 926. There was testimony that the streets were empty and that the defendant was the only person out on the street. Id. Moreover, it appears that the police did not initially detain the defendant, but merely stopped their cruiser in his path and inquired if he knew anything about the rape. Id. at 924. It was only after the defendant gave somewhat dubious responses to the officer's questions that he was asked to accompany the officer to the scene of the crime. Id. Although this court described the encounter as a "detention," id. at 925, it appears that it became a detention only when the defendant was removed to the crime scene.
[9] Later, a handgun was recovered from the Pinto, and Hatcher gave officers a "positive ID on the weapon." It appears, however, that these events occurred after T.L.L.'s seizure by the police.
[10] Although, as we have noted, the officers located a car which Mr. Hatcher identified as the one in which the robbers had been riding, the trial judge discounted this information because the District did not prove that the officers were aware of it at the time T.L.L. was detained. We agree with the judge's assessment of the record in this regard.
[1] See also Martin v. United States, 567 A.2d 896, 902 n. 16 (D.C.1989), appeal after remand, 605 A.2d 934 (D.C.), cert. denied, 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992). The majority maintains that the respondent's trial testimony cannot be considered because it was disputed in the sense that it contradicted the earlier testimony of the investigating officer. We said in Martin that we can consider "undisputed trial testimony," and there is no question that respondent's testimony was not disputed at trial. Id. In any event, I question whether it is reasonable for us to ignore the testimony of the respondent when it corroborates the testimony of the government's principal witness at the suppression hearing on points so crucial to a resolution of the issues presented.
[2] The offense took place April 5, 1995. The court file reflects that respondent was born May 6, 1981, and respondent stated the same at the beginning of the hearing.
[3] The trial judge did expressly state, however, that the fact that these events occurred in the early morning hours, when fewer people are out and about, weighed in favor of upholding the legality of the stop.
[4] There was no testimony concerning the age of the others in the group with respondent. Officer Sharp testified, however, that at least two of the group matched the broadcast description, i.e., they were teenagers. Also, respondent testified that the people with him were his friends and that they had gone together to a nearby store earlier in the evening to buy snacks. In his findings, the trial judge referred to them as "young men or older boys." Counsel for respondent did not question that characterization. I think it fair to infer, therefore, that respondent's companions were all close in age to respondent.
[5] This was actually the officer's second pass by the building. She testified that at some unspecified time earlier in her tour of duty she had driven by the apartment house. At that time, respondent's group was not present.
[6] The time lapse between the offense and the locating of the suspects is an important factor whose significance depends, as with most of the other facts, upon the circumstances of the case. There is no magic formula. In one case, with concededly more precise descriptions, we upheld a stop that occurred in the middle of the day, ten to fifteen blocks from the crime scene, over an hour after the offense was committed. See In re M.E.B., 638 A.2d 1123, 1125 (D.C.1993).
[7] The officer's suppression hearing testimony was impeached with his probable cause hearing testimony. The latter could be considered by the trial judge as substantive evidence. See D.C.Code § 14-102(b)(1) (1998 Supp.).
[8] The trial judge's findings on this point are set out in their entirety in the appendix to this opinion. The majority states that it is unlikely that the trial court would reject the investigating officer's earlier testimony because it was given soon after the events. It appears to me the trial judge did reject the testimony; but, if there is any question on that score it is not the majority's place to resolve the issue. Instead, the matter should be returned to the trial court for an explicit finding on that point. By not remanding for that purpose, the majority appears to be holding that even if the investigating officer's testimony is discounted, and even if the respondent's trial testimony is not considered, see note 1, supra, there were insufficient grounds for stopping respondent. If the majority is of that view, it should say so.
[9] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).