*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-FS-1125

IN RE D.M.,
APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(DEL-857-11)

(Hon. Patricia A. Broderick, Trial Judge)

(Argued February 20, 2014                    Decided July 10, 2014)

*Fleming Terrell*, with whom *James Klein* and *Jaclyn S. Frankfurt* were on the brief, for appellant.

*Janice Y. Sheppard*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Rosalyn C. Groce*, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Before BLACKBURNE-RIGSBY, *Associate Judge*, and PRYOR and KING, *Senior Judges*.

KING, *Senior Judge*:  After a bench trial, D.M. was convicted of second-degree burglary,[1] felony destruction of property,[2] and second-degree theft.[3]  D.M.

---

[1] D.C. Code § 22-801 (b) (2008).

(continued…)

appeals the trial court's denial of his motion to suppress a show-up identification and evidence obtained pursuant to his arrest thereafter. Specifically, he contends his seventy-five minute detention was an unconstitutional seizure because (1) the length of his detention converted a temporary investigatory stop into a *de facto* arrest, and (2) the police could have used less intrusive means to accomplish their investigation. We disagree that the length of his detention or the possibility that the officers could have accomplished their objective by alternative means made his seizure unreasonable *per se*. However, concluding the trial court did not have sufficient evidence, as a matter of law, to find that the length of the detention was necessary and that the police acted diligently in pursuing the purpose of the stop, we reverse the order denying D.M.'s motion.

**I.**

Shortly after 10:00 a.m., on April 14, 2011, Anthony Pickett was in the kitchen at his mother's house on Jay Street, N.E. Through the kitchen window he

---

(…continued)

[2] D.C. Code § 22-303 (2008).

[3] D.C. Code §§ 22-3211, -3212 (b) (2008).

observed five juveniles behind the next-door neighbor's home. He continued to watch as one of the juveniles broke a window on the neighbor's back door and enter the home. Two other juveniles, one of whom Pickett would later identify as D.M., followed the first inside. Pickett's mother called 911 and Pickett provided a description of the individuals. Pickett testified at D.M.'s trial[4] that D.M. had "some kind of hat or something across his face, but he took it off" at some point and Pickett could clearly see D.M.'s face. After a time, D.M. and the other two individuals came back out of the house and all five juveniles ran off down the alley.

Officer Demar Rodgers received a radio call for a burglary in process and responded to the scene. Pickett gave Rodgers a description of the teenaged males, including a description of their clothing. Rodgers broadcasted a lookout for the individuals over his radio. Officers Robert Munn and Calvin Awkward, and Detective Chad Howard, also responded to the radio call. They began to canvas the area, driving past the scene of the burglary on Jay Street, parallel to the alley down which the juveniles had run. As the police officers passed an apartment

---

[4] The trial court initially heard testimony from the government's witnesses for the purpose of ruling on D.M.'s motion to suppress, and then incorporated that testimony as evidence in D.M.'s trial.

building directly across from where the alley opened onto Jay Street, they noticed a group of individuals standing out front. Munn and Awkward stopped at the building while Howard doubled back, having passed the building before noticing the group. The individuals looked at the police vehicle and hurried down the steps in the building and out of sight.

Munn and Awkward went into the building and found four young men gathered on the lower landing, D.M. among them. Once they stopped the group, the officers asked their names and some general questions. The officers "didn't really do an investigation" at that point, but just stopped the individuals "until the detective did his investigation." After Howard arrived, he observed that D.M.'s clothing matched one of the lookout descriptions: a black jacket and tan pants. Howard and the other officers obtained information from each individual about where they lived and went to school. D.M. was detained further while the other juveniles were released to their school because they didn't match the lookout description as completely as D.M.

At some point after D.M. was stopped, Howard left the apartment building and returned to the scene of the burglary to contact Pickett. Howard testified that he interviewed Pickett, obtained a "description of whom he saw exiting the house

and running down the alley," placed Pickett in his car and took Pickett to the apartment to perform a show-up identification of D.M. Pickett testified that he had to return from work to meet Howard and perform the show-up identification. Neither Pickett or Howard testified about where Pickett worked, when or how Howard contacted Pickett, or the timetable of events leading up to the show-up identification. Pickett identified D.M. during the show-up as one of the youths who entered the house. Howard confirmed that the juveniles were stopped at 10:37 a.m. and the show-up occurred at 11:52 a.m.

In his pre-trial motions, D.M. argued, *inter alia*, that the police did not have reasonable suspicion to stop the individuals[5] and that, even if the stop was justified as an investigatory stop, his prolonged detention exceeded the allowable scope of such a stop. Following the testimony of the government's witnesses, the trial judge denied D.M.'s motion concluding that

> what Detective Howard said was after stopping [D.M.],
> he returned to the event location, contacted the witness,
> got a description of what the witness saw and then took
> him back to the scene. So the entire time he was

---

[5] The government acknowledged the officers did not have probable cause to arrest D.M. before Pickett's identification. D.M. does not renew on appeal his argument that the police lacked reasonable suspicion to stop the juveniles.

> diligently pursuing the police investigation. So I do not find that the time was ill-spent or too long under the circumstances, particularly because Mr. Pickett indicated that he had to return to the scene.

## II.

Our review of the denial of a motion to suppress is limited. *Womack v. United States*, 673 A.2d 603, 607 (D.C. 1996). We must "view the evidence presented at the suppression hearing in the light most favorable to the party prevailing below, and we draw all reasonable inferences in that party's favor." *Id.* We must also defer to the trial judge's factual findings, including resolution of conflicting testimony, unless "they are clearly erroneous, *i.e.*, without substantial support in the record." *Lawrence v. United States*, 566 A.2d 57, 60 (D.C. 1989); *see also In re T.L.L.*, 729 A.2d 334, 339 (D.C. 1999) ("[W]e will not disturb the trial judge's findings of fact unless they lack evidentiary support in the record."). The trial court's ultimate conclusion of the constitutionality of a seizure is a question of law that we review *de novo*. *Womack*, 673 A.2d at 607. That is, we review *de novo* whether the prosecution met its burden of proving by a preponderance of the evidence that a seizure was constitutionally permissible. *See Mayes v. United States*, 653 A.2d 856, 861 (D.C. 1995); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) ("It is the State's burden to

demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.").

The Fourth Amendment protects against unreasonable search and seizure. The touchstone of the Fourth Amendment is reasonableness. *See, e.g.*, *United States v. Sharpe*, 470 U.S. 675, 682 (1985) ("The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." (emphasis in original)); *see also Womack*, 673 A.2d at 607 ("The basic question presented is whether, under all the circumstances, the seizure . . . was reasonable."). "[C]onsistent with the Fourth Amendment, the police may briefly detain an individual for investigative purposes, even if they lack the probable cause to arrest, so long as the officers have a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." *Womack*, 673 A.2d at 608 (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.").

The Supreme Court has articulated a "dual inquiry for evaluating the reasonableness of an investigative stop" in which we examine: (1) "whether the officer's action was justified at its inception," and (2) whether the actions were "reasonably related in scope to the circumstances which justified interference in the first place." *Sharpe*, 470 U.S. at 682 (quoting *Terry*, 392 U.S. at 20). D.M. does not dispute on appeal that MPD officers had a reasonable, particularized, and articulable suspicion on which to justify stopping D.M. We are not, therefore, concerned with the first part of this inquiry. Instead, we focus on D.M.'s challenge under the second part of this analysis.

As we have observed, the "measure of the scope of permissible police action in any investigative stop depends on whether the police conduct was reasonable under the circumstances." *In re M.E.B.*, 638 A.2d 1123, 1127 (D.C. 1993); *see also Royer*, 460 U.S. at 500 ("The scope of detention must be carefully tailored to its underlying justification."). Police conduct exceeds the scope permissible under *Terry* when "the police seek to verify their suspicions by means that approach the conditions of arrest." *Royer*, 460 U.S. at 499; *see also Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty.*, 542 U.S. 177, 186 (2004). Criminal cases provide "endless variations in the facts and circumstances" such that there can be no clear "litmus-paper test" or bright line determining where police action has

become unreasonable. *Royer*, 460 U.S. at 506. However, several factors have been identified as important and helpful guideposts in evaluating the scope of a stop: (1) the length of the detention, (2) the place of detention, (3) the use of handcuffs or force to restrain the suspect, and (4) the investigative methods employed. *See, e.g.*, *Royer*, 460 U.S. at 500, 502-05; *In re M.E.B.*, 638 A.2d at 1128; *Davis v. United States*, 498 A.2d 242, 245 (D.C. 1985).[6]

D.M. makes no argument regarding to the place of detention or the use of handcuffs or force.[7] D.M.'s argument focuses on the length of his detention and the investigative methods employed by the officers.

## A.

The Supreme Court has made it clear that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the

---

[6] This list is not exhaustive and we remain cognizant of the fact that the *reasonableness* of police actions under the totality of the circumstances remains the core measure by which to determine the legality of searches and seizures.

[7] The record indicates that D.M. was detained in the hallway where he was seized until he was moved outside for the show-up identification. There is also no indication that D.M. was handcuffed at any point.

stop." *Royer*, 460 U.S. at 500. The Court has stressed that brevity is an important aspect of *Terry* stops and that "in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *United States v. Place*, 462 U.S. 696, 709 (1983). "[I]f an investigatory stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Sharpe*, 470 U.S. at 685. Thus, in order to show an investigatory stop is constitutional, the government must show that the length of detention was necessary to quickly confirm or dispel suspicions and that the police diligently pursued their investigation. *See Sharpe*, 470 U.S. at 686.

D.M. contends that his seventy-five minute detention was beyond the bounds permitted by *Terry*. He argues that the extreme length of his detention alone compels this conclusion. We do not agree. The Supreme Court has declined on multiple occasions to "adopt any outside time limitation for a permissible *Terry* stop," and so do we. *See Place*, 462 U.S. at 709. "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685.

D.M. points to the Supreme Court's decision in *Place* to support his argument that a detention over one hour approaches a level of per se unreasonableness. That reliance is misplaced. The Court itself has clarified that, regardless of the specific language used in *Place*,

> the rationale underlying [the conclusion that a ninety-minute detention was unreasonable] was premised on the fact that the police knew of respondent's arrival time for several hours beforehand, and the Court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity of holding respondent's luggage for 90 minutes.

*Sharpe*, 470 U.S. at 684-85. No analogy exists on the circumstances presented here. The officers responding to the burglary call could not have prepared in advance for the fluid situation in which they found themselves. *Cf. Sharpe*, 470 U.S. at 686 ("A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation . . . ."). D.M.'s detention was not prolonged because the police failed to prepare in advance of his seizure. Thus, he cannot rely on the underlying rationale used in *Place*.

That said, we have never upheld a seizure for over an hour while police arranged a show-up identification. *See, e.g.*, *Hicks v. United States*, 730 A.2d 657,

660 (D.C. 1999) (concluding a twenty-five minute detention for a show-up identification was reasonable); s*ee also McIlwain v. United States*, 568 A.2d 470, 473 (D.C. 1989) (finding a thirty-minute detention while awaiting arrival of "law enforcement officers specially trained to deal with the uniquely difficult offense of sexual abuse of a child" did not convert *Terry* investigatory stop into an unlawful arrest); *accord Place,* 462 U.S. at 710 ("[W]e have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case."). While it is not impossible for a detention of a suspect for over an hour to be reasonable, *see, e.g.*, *United States v. Richard*, 500 F.2d 1025, 1029 (9th Cir. 1974) (upholding a detention of slightly over an hour "where the suspects' own unsatisfactory responses to legitimate police inquiries were the principal cause of the extended detainment"), courts appear to conclude, more often than not, that such lengthy detentions are unreasonable. *See generally* 4 WAYNE R. LAFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.2 (f) n. 258 (5th ed. 2012) (listing cases holding detentions over one hour were unreasonable). We are not aware of any precedent in any jurisdiction upholding the detention of a suspect for over an hour while a show-up identification was arranged.[8] However, we need not resolve that question on the

---

[8] The government has not cited to us any such case in its brief. The cases

(continued…)

case *sub judice*—nor could we—because, as we discuss *infra*, the record is inadequate to evaluate the key factors necessary for a proper analysis. We simply re-enforce here that there is no bright-line time limit demarcating investigatory stops and arrests, and that each case must be evaluated on its particular circumstances and facts.

---

(…continued)

the government cites all contain extenuating facts not relevant for comparison here or involve a seizure of luggage while a warrant is sought, a situation we will not analogize to the seizure of a person while an eye-witness is procured for identification. *See Buck v. State*, 522 S.E.2d 252, 829-30 (Ga. Ct. App. 1999) (concluding officers acted reasonably by detaining the appellant for an hour as their initial contact revealed evidence that he was carrying a pair of women's shoes, was acting nervous, and there was evidence of a struggle, torn clothing, and high-heel prints nearby causing "suspicion that a woman may have been a victim of foul play"); *Miller v. Commonwealth*, 434 S.E.2d 977, 980-81 (Va. Ct. App. 1993) (upholding court's determination that an hour-long traffic stop was reasonable because it was pursued "largely with defendant's cooperation and agreement" and that the court's finding the duration was reasonable was "neither plainly wrong nor without evidence to support it"); *see also United States v. Bory*, 766 F.2d 304, 307 (7th Cir. 1985) (describing how DEA agents confiscated luggage, wrote the appellant a receipt, and "explained how he could recover the bags should no warrant be obtained or no drugs found"); *Limonja v. Commonwealth*, 375 S.E.2d 12, 17-18 (Va. Ct. App. 1988) (concluding that the duration of a traffic stop was not unreasonable because "only twenty-two minutes of the detention were without consent, not sixty, as the defendants contend" and listing cases involving "delays necessitated by efforts to obtain a narcotics dog for sniffing luggage or packages, as in this case").

**B.**

In addition to examining the length of the detention, a plurality of the Supreme Court has opined that courts should examine whether "the investigative methods employed [were] the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. However, where the police have chosen a reasonable means to investigate suspicious activity, and the means chosen is likely to confirm or dispel suspicions quickly, we will not second guess that choice. *Sharpe*, 470 U.S. at 686. Thus, as a majority of the Court articulated, "the question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it." *Id.* That is, we review whether the police acted reasonably in pursuing the investigative methods they chose under the circumstances—not whether other reasonable, though perhaps less-intrusive, methods were available.

Nevertheless, D.M. argues that his detention was unlawful because there were less-intrusive means by which the police could have accomplished their investigation. He posits that because the officers knew his name and where he went to school they could have found him again later and performed the

identification at that point.[9] We have previously rejected this type of logic because it "could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." *Womack*, 673 A.2d at 613 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-57 n.12 (1976)). It is always possible to envision *post hoc* a "better" or "less intrusive" manner by which the police may have conducted their investigation. *See Sharpe*, 470 U.S. at 686-87 ("A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."); *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973) ("The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the [police action] unreasonable."). We do not engage in such "armchair quarterbacking" or "unrealistic second-guessing." *Womack*, 673

---

[9] D.M. compares the case *sub judice* with *Davis*, urging that we adopt a rule requiring police in such situations to release the individual for later identification. In *Davis*, the police released a suspect after detaining him for fifteen minutes while trying—unsuccessfully—to persuade two witnesses to identify him. 498 A.2d at 245. The suspect was later identified from a photo array and lineup. *Id.* at 244. *Davis* did not articulate the rule that D.M. would have us implement, instead it merely concludes that under the circumstances of the case, a fifteen minute detention was not "transmute[d] into an arrest." *Id.* at 245. While releasing a non-dangerous, known suspect pending later eyewitness identification may be most reasonable in certain situations, we decline to articulate a rule requiring police to do so. Such a rule would impinge the ability of police to reasonably respond to the exigencies of the unique and fluid situations with which they are faced.

A.2d at 614. Instead, our review is limited to whether the actions undertaken by the police were reasonable under the circumstances.[10]

We note that the police in this situation only engaged in general questioning of the detained minors regarding their identities and why they were in the hallway. In locating a suspect involved in a consummated crime, "the ability to briefly stop [a] person, ask questions, or check identification . . . . may be most reasonable in light of the facts known to the officers at the time." *Davis*, 498 A.2d at 245 (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)); *accord Hiibel*, 542 U.S. at 186 ("Our decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops."). This is not a case where the police engaged in what could be effectively considered custodial interrogation designed to obtain incriminating statements from the minors. *Cf.*

---

[10] D.M.'s argument is also based on pure conjecture of what the police "might" have done at the time. For example, D.M. asserts that the police could have taken his photograph, released him, and asked Pickett to identify him from a photo array. There is no indication in the record that such a procedure was possible—no evidence the officers at the scene had the ability to take photographs or whether a photographer was available to respond to the scene and how long it would take for a photographer to arrive. Generally, under the circumstances such as those before us, a show-up identification may be the most efficient investigatory procedure available to the police. *See Turner v. United States*, 622 A.2d 667, 672 (D.C. 1993) ("[I]dentifications conducted soon after the crime enhance the accuracy of witnesses' identifications and allow innocent suspects to be quickly freed.").

*Dunway v. New York*, 442 U.S. 200, 216 (1979) ("[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest."). Were it such a situation, the manner of investigation may have been more suspect.

## III.

While the foregoing illustrates that there is no *per se* time limit for detention, it does not address whether—once the decision was made to conduct a show-up— the police acted diligently in contacting Pickett and bringing him to the scene, or whether any delay was necessary for completing the show-up. That the police did act diligently and that any delay was reasonable and necessary to affect the investigation are factual matters the government has the burden of proving. *See Mayes*, 653 A.2d at 861.

In evaluating the evidence, the trial court must not simply accept conclusory assertions that would justify the search, "but rather must evaluate the facts underlying those assertions." *Sanders v. United States*, 751 A.2d 952, 955 (D.C. 2000). To properly evaluate the underlying facts, the judge must be apprised of

sufficient facts relating to the justification for and scope of a seizure. *See In re T.L.L.*, 729 A.2d at 341. Where no such evidence is adduced, the government cannot carry its burden even if, had the record been more fully developed, the government could have otherwise presented sufficient evidence. *See id.* ("If the nature of the information on which the police relied had been disclosed to the court at the hearing on T.L.L.'s motion to suppress, this might well have satisfied the District's modest burden in a case of this kind . . . .").

The only testimony offered at the motions hearing relevant to D.M.'s seventy-five minute detention was a single statement by Pickett and a single statement by Howard. In discussing how he came to identify D.M. during the show-up, Pickett testified:

> I had to go to work. So, I had to come all the way back from Deanwood to come back to take care of this. So, when I walked down the street I met the detective right here and we got in the car and he drove I would say where the apartments was and the apartments, this is where the other squad car was with the young man in it. So, we drove like right here and he stopped and he got out of the car and identified him and then I said yeah, that is him.

Howard's sole testimony as to what happened after the minors was stopped:

> I contacted the witness.  I interviewed the witness, got his description of whom he saw exiting the house and running down the alley, but placed him in the car with me and took him back to the scene w[h]ere we responded and the other individual was stopped to do a show up with each one of those individuals.[11]

Howard never testified that he had to call Pickett at work or that he had to wait for his arrival.

The government provides two justifications for the delayed show-up identification.  First, it points out that Pickett had to return from work.  The record bears this out, but it does not indicate where Pickett worked, nor how long it took him to return from work, nor when the officers called him to request his presence.[12]  Second, the government posits that the police had to "conduct an investigative stop on not one but four juveniles."  The record also shows this to be true.  However,

---

[11] Howard also confirmed on cross-examination the general timeframe of events:  the lookout was broadcast at 10:15 a.m., the minors were stopped at 10:37 a.m., and the show-up identification occurred at 11:52 a.m.

[12] Pickett simply testified he had to return from "Deanwood."  Deanwood is the name of the neighborhood where the events occurred.  There is no indication whether his work location was close at hand or further removed from his home.

there is no evidence in the record about how long it took the four officers present at the scene[13] to obtain identification information, to decide to conduct a show-up, or to contact Pickett.

The reasonable inference from the facts adduced in the hearing is that Pickett went to work after his initial conversation with the police and had to return from work before he could participate in the show-up identification. This inference is not only reasonable on the facts, but is one we are compelled to accept. *See Womack*, 673 A.2d at 607. However, any further assumptions about the nature and timing of what occurred between the time that Pickett left for work and when he returned home for the identification would be purely speculative on this record. "Conclusions arising from speculation do not satisfy the requirement of proof by a preponderance of evidence." *Rule v. Bennett*, 219 A.2d 491, 495 (D.C. 1966).

It would be merely speculative on this record to conclude that there was no unnecessary delay in the show-up identification or that the police acted diligently. *Cf. United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) ("It is the

---

[13] Howard testified that in addition to himself, Detective Wood, Officer Munn, and Officer Awkward were present when the minors were stopped—Munn and Awkward made the initial contact, but Howard only had to double back to the apartment to join the investigation.

government's burden to show that the evidence at issue would have been acquired through lawful means . . . .  However, the Supreme Court made clear in *Nix* that the analysis should focus upon the historical facts capable of ready verification, and not speculation." (citing *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)); *United States v. Driver*, 776 F.2d 807, 810-11 (9th Cir. 1985) ("Because of the intrusive nature of a warrantless arrest, the government must demonstrate specific and articulable facts to justify the finding of exigent circumstances, and this burden is not satisfied by leading a court to speculate about what may or might have been the circumstances.").  We likewise cannot say that it is an obvious conclusion from the record that it reasonably and necessarily took seventy-five minutes for Pickett to be notified and return from work.  *Cf. Womack*, 673 A.2d at 614 (recognizing obvious inferences in the record).  The record is too thinly developed to conclude that it is more likely than not that the police acted diligently and that any delay was necessary to complete their investigation.  *See Sanders*, 751 A.2d at 955.

It may well be that D.M.'s "longer detention was simply the result of a graduated response to the demands of the particular situation." *Sharpe*, 470 U.S. at 688 (alterations and ellipses omitted) (quoting *Place*, 462 U.S. at 709 n.10).  However, because of the limited factual record established by witness testimony the evidence in the record is insufficient to support the trial court's factual

conclusion that the police acted diligently. *Cf. Sanders*, 751 A.2d at 956 (finding evidence in record insufficient to establish, as a fact, the reliability of a tipster). As such, the government failed to meet its burden to prove the show-up identification was not the product of an unlawful seizure, and the trial court therefore erred in denying D.M.'s motion to suppress and his adjudication of delinquency must therefore be reversed.[14] *See In re K.P.*, 951 A.2d 793, 798 (D.C. 2008). The case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[14] The government argues as an alternative ground to support the length of D.M.'s detention that the officers could take him into custody for violating the school attendance requirements of D.C. Code §§ 38-202, -251 (a)(3) (2001). However, such a seizure only subjects the minor to "a temporary investigative seizure designed to determine whether he was truant" and then to transport the truant minor to a truancy center. *See In re A.J.*, 63 A.3d 562, 568 (D.C. 2013); *see also* D.C. Code § 38-251 (a)(2). The government's reliance on this provision fails because the other three minors were "driven to school and released" while D.M. remained in custody. D.M.'s continued detention was only justified at that point upon his suspected role in the burglary and the length of his detention must be measured by that metric, not by his truancy.