*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-462

RASHAD ELLISON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-12054-18)

(Hon. Kimberley S. Knowles, Trial Judge)

(Submitted May 13, 2020                    Decided October 1, 2020)

*Richard Seligman* was on the brief for appellant.

*Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Dana Joseph*, and *Steven B. Snyder*, Assistant United States Attorneys, were on the brief for appellee.

Before BECKWITH and DEAHL, *Associate Judges*, and FISHER, *Senior Judge.**

---

* Judge Fisher was an Associate Judge at the time of submission. His status changed to Senior Judge on August 23, 2020.

DEAHL, *Associate Judge*: A police officer saw Rashad Ellison engage in what he suspected was a hand-to-hand drug deal. Mr. Ellison exchanged a small item retrieved from the front of his waistband for cash. The officer radioed details of the transaction and descriptions of its participants to nearby officers who were on the scene as part of a narcotics investigation. Officers stopped and searched the presumed buyer, after he briefly entered and exited a store in the area, and recovered a small bag of crack cocaine on him. A different officer—who had already detained and patted down Mr. Ellison based on the observed transaction—then conducted an extensive search of Mr. Ellison on the scene, rifling through his shorts, but uncovered nothing incriminating. Officers then transported Mr. Ellison to a police station and conducted a strip search, which uncovered forty-six small bags of crack.

Mr. Ellison moved to suppress those narcotics as having been obtained in violation of his Fourth Amendment rights. The trial court denied his suppression motion, and Mr. Ellison pled guilty to distribution of cocaine, in violation of D.C. Code § 48-904.01(a)(1) (2014 Repl. & 2020 Supp.), and possession with intent to distribute cocaine, in violation of D.C. Code § 48-904.01(a)(1). He reserved his right to appeal the court's suppression ruling. *See* Super. Ct. Crim. R. 11(a)(2). Mr. Ellison now raises two Fourth Amendment claims on appeal. First, he argues that his pre-arrest detention was longer than permitted under *Terry v. Ohio*, 392 U.S. 1

(1968). Second, he argues that the government lacked probable cause to search and arrest him. We disagree on both points and affirm.

## I.

On August 14, 2018, a team of officers from the Metropolitan Police Department was staking out the 800 block of 21st Street NE as part of a narcotics investigation. Officer Troy Hinton was the "eyes" of the operation, watching from a nearby observation post and relaying what he saw (via radio) to other members of the team. Just after 5:00 p.m., Officer Hinton saw what he believed to be a hand-to-hand narcotics exchange between two individuals, and he later identified Mr. Ellison as the apparent seller. Officer Hinton radioed that he saw the seller reach into his front waistband, retrieve a small object, and exchange it with the buyer for cash. Officer Hinton described the seller as a black man wearing a turquoise tank top and grey shorts, and riding a yellow bicycle. He described the buyer as black man wearing a tank top who drove away in a black Acura, and he provided the license plate number. Officer Andrew Stout, along with his partner, tailed the buyer and radioed two communications relevant here: (1) he indicated that he was "going to stop the buyer" and instructed Officers Benjamin Rubin and Apolinar Nunez to "stop the seller," and about three minutes later (2) he indicated that he was "about to" stop

the buyer and told Officers Rubin and Nunez, "if you want to go toward the seller, go for it." Officer Hinton immediately added, "make sure they get a recovery before y'all pop that seller."

Officers Rubin and Nunez then apprehended Mr. Ellison, who matched the description of the seller. Officer Rubin placed him in handcuffs and conducted a pat down frisk of his waistband, finding nothing. Officer Rubin did not place Mr. Ellison under arrest at that point, but detained him as other officers investigated whether the buyer in fact obtained illegal narcotics. In the meantime, Officer Stout stopped and searched the buyer as he exited a nearby convenience store, and recovered a small bag of crack from his pocket. His partner radioed that they found crack on the buyer, to which Officer Nunez—sitting in a police cruiser apart from Officer Rubin, which is apparently where he remained after the initial stop—responded "copy." By this point, Mr. Ellison had been detained for about three minutes.

After an additional seven-minute delay apparently caused by Officer Nunez's body worn camera malfunctioning, another officer arrived to assist Officer Rubin, who then conducted a thorough on-scene search of Mr. Ellison. After several minutes of probing through Mr. Ellison's shorts and underwear, Officer Rubin found

some money in Mr. Ellison's shorts but no narcotics. The officers then formally arrested Mr. Ellison, transported him to the police station, and conducted a strip search, finding forty-six bags of crack. Mr. Ellison was later indicted for both distribution of cocaine, in violation of D.C. Code § 48-904.01(a)(1), and possession with intent to distribute cocaine, also in violation of D.C. Code § 48-904.01(a)(1).

Mr. Ellison moved to suppress the recovered narcotics as being the fruit of an illegal search in violation of his Fourth Amendment rights. The trial court held an evidentiary hearing dedicated to the motion. At the close of evidence, the government stressed the recovery of crack from the buyer as critical to the probable cause calculus, stating there was "probable cause to search [Mr. Ellison] after the zip [was] found on the buyer," "they had probable cause specifically after they found . . . controlled substances in the buyer's shorts." Mr. Ellison's counsel argued that reliance was misplaced because it was unclear if Officer Rubin, who conducted the on-scene search and effectuated the arrest, was aware that crack was recovered from the buyer.

The trial court denied Mr. Ellison's suppression motion. The judge focused on two questions relevant to Mr. Ellison's Fourth Amendment challenge. First, she addressed whether there was reasonable articulable suspicion to believe that Mr.

Ellison had engaged in criminal activity before his seizure. *See generally Terry v. Ohio*, 392 U.S. 1 (1968). She concluded there was. She reasoned that the hand-to-hand transaction witnessed by Officer Hinton, and the detailed description of the seller matching Mr. Ellison, provided the requisite reasonable articulable suspicion for a *Terry* stop.

Second, she addressed whether there was "probable cause to search" Mr. Ellison. She concluded there was not at the time officers initially detained him and patted him down, noting that there was no evidence this was a "high crime area," or that Mr. Ellison secreted the money he received in a suspicious way. But she found probable cause accrued once crack was recovered from the buyer: "[A]t that point there was probable cause, because there was confirmation of" the suspected drug transaction. She did not address if or when Officer Rubin personally learned of that recovery. But she did find that officers recovered crack from the buyer before Officer Rubin conducted the intrusive on-scene search of Mr. Ellison, and before the subsequent stationhouse search yielding the forty-six bags of crack, so that probable cause supported the searches of Mr. Ellison.

After the trial judge denied the suppression motion, Mr. Ellison entered a conditional guilty plea to both counts of the indictment under Super. Ct. Crim. R. 11(a)(2), reserving his right to appeal the suppression ruling.

## II.

Mr. Ellison now makes two arguments attacking the trial court's Fourth Amendment rulings: (1) his pre-arrest detention was too protracted to be justified as an investigatory stop under *Terry*, 392 U.S. at 26 (permitting "brief" investigatory detentions); and (2) in any event, there was not probable cause to arrest and search him. We disagree on both points and affirm. Because our resolution of the second issue informs the first, we begin by addressing probable cause.

### A. Probable Cause

"A search conducted without a warrant is per se unreasonable under the Fourth Amendment unless it falls within a few specific and well-established exceptions." *United States v. Taylor*, 49 A.3d 818, 821 (D.C. 2012) (quoting *Basnueva v. United States*, 874 A.2d 363, 369 (D.C. 2005)) (internal quotation marks omitted). One exception is that officers may conduct a "search incident to a lawful arrest," *id.*, that is, an arrest supported by probable cause, *Dunaway v. New York*, 442 U.S. 200, 213–

14 (1979). The government argues that the on-scene and stationhouse searches of Mr. Ellison both fit within this exception to the Fourth Amendment's warrant requirement.[2] Mr. Ellison's only argument in response is that there was no probable cause to support either search. We disagree.

We begin by clearing away some confusion about whether our inquiry should focus on probable cause to *search*, or on probable cause to *arrest*. Counsel for Mr. Ellison waxes about the difference, suggesting the former was lacking even if the latter existed. But his argument stems from the mistaken (and disadvantageous to Mr. Ellison) premise that probable cause to search alone might have justified the on-scene search but was simply lacking.[3] That is wrong. Probable cause to search,

---

[2] While the on-scene search "did not yield inculpatory evidence," as the government points out, its legality remains relevant. That lengthy and intrusive search exceeded the bounds of a permissible *Terry* stop so that, at least by the time Officer Rubin conducted the search, the stop was transformed into an arrest. *See Womack v. United States*, 673 A.2d 603, 608 (D.C. 1996) ("[W]hen officers subject a detained suspect to a greater restraint on his liberty than is permissible in a legitimate *Terry* seizure, articulable suspicion is not sufficient, and the Constitution requires a showing of probable cause."). If that arrest was not supported by probable cause, we would then have to confront the question of whether the forty-six bags recovered after the subsequent stationhouse search were the fruit of the unlawful arrest, an issue we do not reach.

[3] The mistaken premise echoes the trial judge's own framing of the issue: "Now was there probable cause to search?"; "I believe there was probable cause to search." That is not the question that needed answering. The relevant inquiry was not whether there was probable cause to search, but instead whether there was probable cause to arrest, and if so, was there an actual arrest so that a search was

absent a warrant or some exception to the warrant requirement—like a contemporaneous arrest supported by probable cause, *Knowles v. Iowa*, 525 U.S. 113, 117–18 (1998)—is not an adequate justification for a search. *Taylor*, 49 A.3d at 821; *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) ("[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'") (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

The only exception to the warrant requirement the government advances is that the searches of Mr. Ellison were conducted incident to arrest. Mr. Ellison does not argue that the timing of his on-scene search, preceding the more formal trappings

---

permitted incident to that arrest. Focusing on probable cause to search not only identifies the wrong object of the probable cause inquiry, it also suffers from a more fundamental problem: neither probable cause to search, nor probable cause to arrest, by itself justifies a search. Probable cause to search is the predicate for, not an exception to, obtaining a search warrant. And probable cause to arrest, absent an actual arrest, is likewise insufficient justification for a search. *Knowles v. Iowa*, 525 U.S. 113, 115-16 (1998) (rejecting view that "probable cause to make a custodial arrest" justifies an incident search absent a custodial arrest "in fact"). We see no need to remand for the trial court to focus its findings on the pertinent legal question whether there was probable cause to arrest because we interpret it as having engaged in this inquiry, despite its imprecise phrasing of the pertinent question. And, as discussed below, there is no daylight between the two inquiries: there was probable cause to both search and arrest for the same reasons discussed below.

of his arrest, brings it outside the bounds of the search incident to arrest exception. *See generally Rawlings v. Kentucky*, 448 U.S. 98, 100 (1980) ("Where the formal arrest follow[s] quickly on the heels of the challenged search of [a suspect's] person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."). The government's argument that the on-scene search was incident to Mr. Ellison's subsequent formal arrest despite their inverse sequencing stands unrefuted, and thus conceded. The only remaining question is thus whether there was probable cause to arrest, because aside from an arrest supported by probable cause, "a search incident to the arrest requires no additional justification." *United States v. Robinson*, 414 U.S. 218, 235 (1973).

When reviewing the trial court's determinations, we view "the facts and all reasonable inferences therefrom in the light most favorable to the government as the prevailing party, and we review the Superior Court judge's findings of fact only for clear error." *Logan v. United States*, 147 A.3d 292, 297 (D.C. 2016) (quoting *Towles v. United States*, 115 A.3d 1222, 1228 (D.C. 2015)). We assess the trial court's legal conclusions under the Fourth Amendment de novo. *Jackson v. United States*, 157 A.3d 1259, 1264 (D.C. 2017). Probable cause exists where a reasonable police officer "considering the total circumstances confronting him and drawing from his experience would be warranted in the belief that an offense has been or is being

committed." *Peterkin v. United States*, 281 A.2d 567, 568 (D.C. 1971) (quoting *Lucas v. United States*, 256 A.2d 574, 575 (D.C. 1969) (internal quotation marks omitted). This inquiry "must be guided by practical rather than technical considerations keeping in mind the necessities of the moment and the reasonableness of the officers' actions." *Id.*

We agree with the trial court, aside from its framing of the issue, *supra* note 3, that there was probable cause to arrest Mr. Ellison once a small bag of crack was recovered from the buyer. By that point, officers had not only seen Mr. Ellison engage in a hand-to-hand transaction—exchanging a small item from his front waistband for cash—but they had also recovered a small bag of crack from the person he had just transacted with. Mr. Ellison counters that this case is "directly on par" with *Shelton v. United States*, 929 A.2d 420 (D.C. 2007), in which we held that an observed hand-to-hand transaction, without "additional contextual factors," did not supply probable cause, *id.* at 425. We would agree with Mr. Ellison if the initial description of the hand-to-hand transaction were all the information the officers had. But there was considerably more.

Unlike in *Shelton*, here we have the discovery of a small bag of crack on the buyer, which is a significant additional factor, more incriminating than other factors

that we have held provide probable cause when coupled with hand-to-hand transactions. *See, e.g.*, *Jefferson v. United States*, 906 A.2d 885, 886–90 (D.C. 2006) (finding probable cause where defendant engaged in one hand-to-hand, reached into a vehicle to perhaps "re-supply[] himself," and then engaged in another hand-to-hand); *Coles v. United States*, 682 A.2d 167, 168 (D.C. 1996) (finding probable cause because experienced officer observed defendant engage in a hand-to-hand after retrieving a ziplock bag from an apparent stash in a nearby tree-box). One individual's conduct in an observed hand-to-hand transaction can contribute to probable cause to arrest the other. *See Young v. United States*, 56 A.3d 1184, 1192–93 (D.C. 2012) (finding probable cause to search and arrest defendant where other individual in observed hand-to-hand discarded small item upon seeing police). The recovery of crack from the buyer when coupled with the hand-to-hand transaction supplied probable cause to arrest Mr. Ellison, the observed seller.

Mr. Ellison further contends there was little evidence and no trial court finding that Officer Rubin himself, who effectuated the on-scene search and arrest, knew officers had recovered crack from the buyer before searching Mr. Ellison. The government concedes the factual point, but counters that the so-called "collective knowledge" doctrine—sometimes referred to as the "fellow officer" rule, *see generally Whiteley v. Warden*, 401 U.S. 560, 568 (1971)—renders it irrelevant. In

its view, the "collective knowledge of investigating police officers [is] imputable to other officers involved in [the] investigation." *See Smith v. United States*, 358 F.2d 833, 835 (D.C. Cir. 1966) ("[P]robable cause is to be evaluated . . . on the basis of the collective information of the police" instead of just the arresting officer's knowledge.); *Parsons v. United* States, 15 A.3d 276, 279 (D.C. 2011) (explaining the collective knowledge doctrine is "firmly established" to allow information collectively known amongst officers to provide probable cause); *Prince v. United States*, 825 A.2d 928, 932–33 (D.C. 2003) (concluding there was sufficient probable cause even though the arresting officer's knowledge taken alone would not suffice). The government paints with too broad a brush. It is not the case, as the government suggests, that any officer's knowledge is imputable to all others investigating the same crime, without limitation.[4] Nonetheless, we agree on these facts that the

---

[4] The collective knowledge doctrine is more nuanced than that, and we have described it in varying ways that are not so easy to reconcile. *Compare Haywood v. United States*, 584 A.2d 552, 557 (D.C. 1990) ("In cases such as this where probable cause for arrest is predicated in part on the personal observations of the arresting officer, the court may not rely on facts which were available to other officers at the scene unless that information was *communicated to the arresting officer.*"), *with Tetaz v. District of Columbia*, 976 A.2d 907, 914 n.7 (D.C. 2009) ("It does not matter that the particular officers on duty at the Russell Building may not have known of the activity inside the Hart Building. In a case concerning 'a fast-moving sequence of events involving a number of law enforcement officers at several different locations,' this court applies the doctrine of collective knowledge in deciding whether police action was justified.") (citation omitted). We need not decide in this case the precise scope of the doctrine nor do we attempt to reconcile any tension

collective knowledge doctrine applies to factor the crack recovery into the probable cause calculus. Here is why.

It is undisputed that the arresting officer, Officer Rubin, heard Officer Hinton's initial description of the hand-to-hand transaction and description of the seller. And Mr. Ellison does not contest, as the record indicates, that Officer Stout subsequently directed Officer Rubin to stop Mr. Ellison—"stop the buyer," "go toward the seller, go for it"—prompting Officer Rubin to do just that. While those transmissions came before Officer Stout recovered crack from the buyer, we have squarely held that such after-acquired facts may be imputed to the officer who acted on the earlier command under the collective knowledge calculus. *In re M.E.B.*, 638 A.2d at 1132–33 (collective knowledge doctrine accounts for directing officer's knowledge, even that knowledge obtained after directive issued). And because Officer Stout himself recovered crack from the buyer, there is no question that he was aware of the crack recovery before the on-scene search and arrest of Mr. Ellison. That information thus factors into the probable cause to arrest calculus, regardless of whether Officer Rubin himself was aware of the recovery.

---

between the statements above because, as discussed below, we find *In re M.E.B.*, 638 A.2d 1123, 1132–33 (D.C. 1993), to be controlling here.

We do not address the force of the collective knowledge doctrine where an officer is not merely effectuating other officers' directives but exceeds the bounds of (or even contravenes) those directives. Officer Stout's directive was to "stop" Mr. Ellison—to "go for it"—and Officer Hinton immediately rejoined, "make sure they get a recovery before y'all pop that seller." Mr. Ellison might have argued, but does not, that Officer Rubin could not rely on Officer Stout's directive (and all that Officer Stout knew, both before and after issuing it) to justify an intrusion that was not only greater than the one directed, but in contravention of Officer Hinton's contemporaneous direction not to arrest (or "pop") Mr. Ellison unless and until drugs were recovered from the buyer. *See Bryant v. United States*, 599 A.2d 1107, 1112 n.9 (D.C. 1991) ("That the arrest team was entitled to rely on the information transmitted is beyond question. But the scope of justifiable reliance is limited by the objective information imparted.") (internal citations omitted); *United States v. Hensley*, 469 U.S. 221, 232–33 (1985) (finding scope of inquiry conducted in reliance on "wanted flyer" limited by issuing department's knowledge and what is defensible based on "objective reading" of the flyer). The argument is not raised, so we bracket it only to say we do not decide it.

## *B. Prolonged Detention*

Mr. Ellison also argues that his pre-arrest detention was longer than permitted under *Terry*'s rationale permitting brief investigatory stops.[5]  Mr. Ellison complains that he was detained under *Terry* for more than ten minutes, without adequate justification.  But for reasons set forth above, the duration of his *Terry* detention is not the ten-plus minutes between his initial seizure and formal arrest, but just the three minutes that elapsed between his seizure and the accrual of probable cause to arrest.  At that point in time, the officers had adequate justification for the more prolonged detention attendant to an arrest.  And as explained below, that three-minute-long, pre-probable-cause detention was reasonable under the circumstances and justified by *Terry*'s rationale.

In evaluating the legality of a *Terry* stop, we look to "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392

---

[5]  The government argues that Mr. Ellison forfeited this argument because he did not challenge the length of his pre-arrest detention in the trial court, and urges us to apply plain error review.  Mr. Ellison counters that he did adequately preserve the issue.  We do not address the preservation argument because we find that the claim fails on its merits.

U.S. at 19–20.  In general, *Terry* stops are "designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect." *In re A.J.*, 63 A.3d 562, 567 (D.C. 2013) (quoting *In re M.E.B.*, 638 A.2d at 1126); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.").  In reviewing the scope of the stop, we review whether the officers "acted less than diligently, or [whether] they unnecessarily prolonged [the suspect's] detention." *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (emphasis omitted).  Brevity is one factor to consider. *Id.* (citing *United States v. Place*, 462 U.S. 696, 709 (1983)).  Like the Supreme Court in *Place*, though, this court has declined to adopt a bright-line rule that a certain length of time de facto transforms a detention into an arrest. *In re D.M.*, 94 A.3d 760, 765–66 (D.C. 2014) (citing *Place*, 462 U.S. at 709).  Instead, we consider other factors like "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes" and "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 685; *see also In re D.M.*, 94 A.3d at 765 ("Police conduct exceeds the scope permissible under *Terry* when 'the police seek to verify their

suspicions by means that approach the conditions of arrest.'") (quoting *Florida v. Royer*, 460 U.S. 491, 499 (1983)).

Mr. Ellison does not contend that his stop was unjustified at its inception under *Terry*; he concedes that the initial detention was justified. He instead takes issue only with the duration (or scope) of the *Terry* stop. The three-minute duration of the *Terry* stop fits within the time period this court has allowed for investigative stops, on similar facts. *See Speight v. United States*, 671 A.2d 442, 449 (D.C. 1996) (upholding additional detention of appellant for a few minutes so police could search his car even though frisk revealed no weapons or contraband); *Turner v. United States*, 623 A.2d 1170, 1173–74 (D.C. 1993) (upholding detention of appellant for a few minutes to investigate criminal involvement even after police learned they stopped the wrong suspect). There was good reason for the three-minute *Terry* detention: it made sense for officers to further investigate whether the purported buyer had indeed procured narcotics, and once they determined he had, officers had probable cause for the more protracted stop attendant to Mr. Ellison's arrest.

### III.

The judgment of the Superior Court is affirmed.

*So ordered.*